DIGITEL CORPORATION, a
Georgia Corp., Plaintiff,

v.

DELTACOM, INC., an Alabama Corporation, Richard A. Wilkins, John A.R. Smith, and Edward L. Blackwell, Defendants.

Civil Action No. 96–D–106–S.

United States District Court,
M.D. Alabama,
Southern Division.

Nov. 14, 1996.

**6.** *See Mobile County Jail Inmates v. Purvis,* 581 F.Supp. 222 (S.D.Ala.1984).

**1488**

Douglass Taylor Flowers, Lewis, Brackin & Flowers, Dothan, AL, Michael W. Johnston, Scott G. Blews, King & Spalding, Atlanta, GA, for Digitel Corporation.

James N. Nolan, John B. Tally, Jr., Joseph D. King, Lange, Simpson, Robinson & Somerville, Birmingham, AL, for Deltacom, Inc.

Cameron A. Metcalf, Espy & Metcalf, P.C., Dothan, AL, for Richard A. Wilkins.

John A.R. Smith, Dothan, AL, pro se.

William C. Carn, III, Lee & McInish, Dothan, AL, Michael W. Johnston, Scott G. Blews, King & Spalding, Atlanta, GA, Larry Keith Anderson, Dothan, AL, for Edward L. Blackwell.

Michael W. Johnston, Scott G. Blews, King & Spalding, Atlanta, GA, Larry Keith Anderson, Dothan, AL, for Edward L. Blackwell.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Pending before the court is "Plaintiff's Motion for Preliminary Injunction, Expedited Discovery and a Hearing," filed January 19, 1996. A hearing in chambers was held in this matter on April 12, 1996, and the parties agreed that the Court should resolve plaintiff's motion without conducting an evidentiary hearing. Pursuant to the court's orders entered March 20, 1996, and April 17, 1996, each party has submitted briefs and evidence to support its contentions.[1] After careful consideration of the arguments of counsel, the relevant case law and the record as a whole, the court finds that the plaintiff's motion for preliminary injunction is due to be granted in part and denied in part.

### BACKGROUND

Plaintiff, Digitel Corp. ("Digitel") is a Georgia corporation engaged in the business of selling and providing service for telecommunications systems and equipment. Pl.'s Br. (1/19/96) at 1. Defendants Richard A. Wilkins ("Wilkins"), John A.R. Smith ("Smith"), and Edward L. Blackwell ("Blackwell") worked in Digitel's Dothan office, conducting business in Dothan and the surrounding areas. *Id.* Wilkins, Smith and Blackwell are currently employed by Defendant DeltaCom, Inc. ("DeltaCom"). Harwell Aff. ¶ 9; Blackwell Dep. at 24–25. Like Digitel, DeltaCom is also in the business of selling long distance telephone services, telephone systems (i.e., telephone equipment)

---

[1]. The following documents have been submitted: letter response by John A.R. Smith to motion for preliminary injunction filed April 5, 1996; response and brief by Richard A. Wilkins in opposition to motion for preliminary injunction filed April 5, 1996; memorandum and submission (Exhibits A–I) in opposition to motion for preliminary injunction by DeltaCom, Inc., filed April 5, 1996; response and brief by Edward L. Blackwell in opposition to motion for preliminary injunction filed April 9, 1996; evidence submitted by John A.R. Smith in opposition to motion for preliminary injunction filed April 26, 1996; brief by Digitel Corp. in support of motion for preliminary injunction with exhibits and deposition excerpts filed April 26, 1996; second submission by DeltaCom, Inc., in opposition to motion for pre-

liminary injunction filed April 26, 1996; submission of evidence by Richard A. Wilkins in opposition to motion for preliminary injunction filed April 26, 1996; brief and attachments by John A.R. Smith in opposition to motion for preliminary injunction filed May 6, 1996; supplemental brief by Digitel Corp. in support of motion for preliminary injunction filed May 6, 1996; second memorandum and rebuttal submission of evidence by DeltaCom, Inc., in opposition to motion for preliminary injunction (with Exhibits A–F attached) filed May 7, 1996; reply brief by DeltaCom, Inc., in opposition to motion for preliminary injunction filed May 13, 1996; and reply brief by Digital, Inc., in support of motion for preliminary injunction filed May 13, 1996.

and debit cards for prepaid long distance services. Harwell Aff. ¶ 3.

Digitel has filed a Complaint seeking relief against DeltaCom, Wilkins and Smith for breach of non-solicitation agreements, against Wilkins and Smith for misappropriation of trade secrets, against DeltaCom for tortious interference with Wilkins' and Smiths' employment agreements and with Digitel's contractual and business relations, and against Blackwell and Wilkins for tortious interference with contractual and business relations, conversion and misappropriation of trade secrets. Pl.'s Br. (1/19/96) at 1. Additionally, Digitel has requested a preliminary injunction enjoining DeltaCom, Wilkins and Smith from contacting, soliciting or accepting business from former Digitel customers or prospective Digitel customers with whom Wilkins and/or Smith had contact while employed with Digitel.[2]

Operating out of Dothan, Alabama, Digitel and DeltaCom are both telecommunications businesses engaged in the business of providing telephone services and equipment to commercial enterprises. Digitel came to the Dothan area in September, 1989, after purchasing the assets, inventory, customer base and goodwill of the telecommunications business of TelPlus Communications, Inc. in Alabama and the Florida panhandle. Tate Aff. at ¶ 4. Digitel's primary focus is on equipment sales and service and its revenues in 1995 were approximately $11 million. Id. at ¶¶ 2, 3.

DeltaCom, on the other hand, is a company primarily providing long distance telephone services, operating in Florence, Huntsville, Birmingham, Montgomery, Mobile and Dothan, Alabama, as well as New Orleans and Baton Rouge, Louisiana, and Atlanta, Georgia. Harwell Aff. at ¶ 3. DeltaCom's revenues in 1995 were approximately $57 million. McDonald Dep. at 56–57. DeltaCom entered the Dothan area in 1987 when it acquired a small long distance company called Watts America, but it did not actively solicit telephone equipment in the Dothan area until October, 1995. Harwell Aff. at ¶ 5; McDonald Dep. at 66. Prior to October, 1995, DeltaCom and Digitel often found themselves sharing customers, with DeltaCom providing a long distance service and Digitel providing the telephone equipment. Id. at ¶ 6. In fact, the two companies would sometimes prepare joint proposals to customers, or DeltaCom's long distance salespeople would recommend Digitel equipment to their long distance customers, while Digitel would recommend DeltaCom as a long distance carrier. Id.

DeltaCom and Digitel at no time entered into an agreement precluding DeltaCom from soliciting hardware and service business from any customer in the Dothan area. DeltaCom's Second Br. at 3. In October, 1995, DeltaCom decided to actively compete with Digitel by entering into the telephone equipment sales and service market. Having obtained "better operational control" of its telephone equipment sales divisions in Huntsville and Birmingham, DeltaCom decided to establish an equipment sales and service division in Dothan. McDonald Dep. at 67–70.

Before November, 1995, Digitel had four employees in its Dothan office: Wilkins, the senior manager for Alabama and Northwest Florida; Smith, an account executive/salesperson; Blackwell, a service technician; and Brian Poole, another service technician.[3] Wilkins Dep. at 20–22; Smith Dep. at 67, 42.

---

**2.** Initially, Digitel requested preliminary injunctive relief with regard to Blackwell's and Richard Wilkins' alleged misappropriation of a list of modem numbers and access codes. Digitel claimed that Blackwell and Wilkins took and refused to return to Digitel the only list of the current modem numbers and access codes, which are necessary in order for Digitel to gain off-site connections to its Dothan area customers' telecommunications systems and equipment. See Pl.'s Br. at 17–21 (1/19/96). Consequently, Digitel wanted an injunction directing Blackwell and Wilkins to provide Digitel with the list of the current modem numbers or access codes for its Dothan customers. Keri Caswell, a current employee of Digitel, testified, however, that "Digitel now has current modem numbers and passwords for the customers previously serviced from its Dothan office." Caswell Dep. ¶ 7. Because Digitel's harm in this regard appears to be remedied, the court will not address the issue of injunctive relief against Blackwell.

**3.** Because he is not a named party to this action, the court will not discuss Poole or his involvement in any detail.

Wilkins began working for Digitel in April 1991, or 1992, as a sales representative and eventually he was promoted to general manager. Wilkins Dep. at 13, 20. Smith joined Digitel some time later, around 1994. Smith Dep. at 24. Both men, as part of their compensation plan, had agreed to a non-solicitation provision which stated in part:

> I also agree that due to the sensitively [sic] and confidentially [sic] of materials and information which will be divulged to me, that I will refrain for a period of two years from termination, from soliciting or accepting, directly or through others, any business from any of Digitel's customers, including actively sought perspective [sic] customers with whom I have had contact with during my employment with Digitel . . [sic] *I also understand that this documentation is intended to describe the method of compensation and should not be considered as a contract on my part, or the part of Digitel Corporation for employment for any specific term.*

Wilkins' General Manager's Compensation Plan ("GM Plan") and Digitel Corp. Account Executive Sales Compensation Program ("AES Program"). Smith signed this agreement on January 20, 1995, with Rick Wilkins signing as Smith's supervisor. *See* AES Program.[4] Wilkins signed his own agreement on January 16, 1995, with Bryan Tate, President of Digitel, also signing the agreement. *See* GM Plan. Wilkins' general managers' compensation agreement was subsequently modified with new bonus incentives but still contained a non-solicitation provision. *Id.* Wilkins, however, did not return the modified agreement to the Human Resources Department because of some concerns he had re-

garding the two-year time provision in the non-solicitation clause.[5] Wilkins Dep. at 75–76. Nevertheless, Wilkins signed the modified agreement on February 13, 1995, and he acknowledges that he was paid by Digitel under the modified compensation plan until his employment with Digitel was terminated. *Id.* Blackwell does not appear to have signed a non-solicitation agreement.

In August or September, 1995, Wilkins, apparently discontented with Digitel, contacted David Harwell ("Harwell"), sales manager at DeltaCom, about working for DeltaCom as a telephone equipment sales representative.[6] Wilkins Dep. at 28–29, 33. In mid to late Fall, 1995, Wilkins met in Dothan with Harwell, Eric Watson ("Watson") who was Harwell's supervisor, and Elisah Kusan ("Kusan"), who served as DeltaCom's technical or engineering department head, to discuss the possibility of Wilkins working for DeltaCom. *Id.* at 33–35. Wilkins, along with Smith, Blackwell and Poole, attended a second meeting in Dothan with DeltaCom executives, Harwell, Watson and Kusan. *Id.* at 37–38. At this second meeting, they discussed the possibility of the Digitel employees working for DeltaCom and the market possibilities in the South Alabama area. *Id.* at 46–47. On November 16 or 17, 1995, DeltaCom sent offers of employment to Wilkins, Smith, Blackwell and Poole. Blackwell Dep. at 24. Wilkins, Smith and Blackwell then submitted their resignations on November 17, 1995, with Wilkins' and Smith's resignations becoming effective December 1, 1995, and Blackwell's resignation becoming effective December 3, 1995. Blackwell Dep. at 25, 56; Wilkins Dep. at 102–03. Digitel then re-

---

4. Smith's non-solicitation agreement varied slightly from Wilkins' non-solicitation agreement, in that Smith's agreement stated that he would not "solicit or accept, directly or through others, any business from any of Digitel's customers, including actively sought perspective [sic] customers with whom *Digitel* has had contact with during [Smith's] employment with Digitel." *See* AES Compensation Program (emphasis added). Digitel, however, "seeks only an injunction forbidding the solicitation of its Dothan area customers and of its actively sought prospective customers with whom Wilkins and Smith had contact during their employment by Digitel." Pl.'s Supp.Br. in Supp. of Pl.'s Mot. for Prelim.Inj. at 23. Consequently, in considering the

validity of the non-solicitation agreements, the court will construe Smith's non-solicitation agreement to be the same as Wilkins' non-solicitation agreement in accordance with Digitel's motion for injunctive relief.

5. It appears that agreements prior to 1995 may have limited the non-solicitation clause to 90 days rather than two years. Wilkins Dep. at 75.

6. Wilkins had previously approached DeltaCom in 1993 regarding employment, but no offer of employment was made at that time. Harwell Aff. at 3–4; Wilkins Dep. at 28–29.

leased Wilkins and Smith from their duties on November 18 or 19, 1995. Wilkins Dep. at 104–06. Eventually, all four Digitel employees were working at DeltaCom: Wilkins, Smith, Blackwell and Poole. Smith Dep. at 42. DeltaCom was aware of Smith's and Wilkins' non-solicitation clauses before hiring them. Harwell Aff. at ¶ 10. Smith discussed the non-solicitation clauses with both Harwell and Watson, and, perhaps with Kusan, and he "faxed" a copy of the clause to Harwell. Smith Dep. at 59–67. Specifically, Smith discussed the clause with Harwell to ensure that the clause "would not be a problem for him." *Id.* at 60. According to Smith, Harwell stated that from DeltaCom's perspective, the clause was not a problem and there was no need for Smith to "worry about it." *Id.* at 61. Smith also states that "at some point in time" Harwell and Watson "emphasized again very clearly not to solicit Digitel['s] customer base." *Id.* 61–63.

Wilkins testified that he too had discussed his non-solicitation clause with Harwell, "faxing" a copy of the clause to Harwell. Wilkins Dep. at 72–75. Wilkins told Harwell that he had not signed the modified compensation agreement and that he thought the non-solicitation agreement was invalid. *Id.* at 74. Harwell, however, instructed Wilkins to adhere to the clause and not to solicit Digitel's customers. *Id.* at 86. Wilkins also testified that his understanding of Harwell's directive was that Wilkins was not to solicit Digitel customers and if any Digitel customers came to him, he was to pass them on to a different DeltaCom representative.[7] *Id.* at 91. Wilkins also understood that he was not to assist on the accounts of former Digitel customers. *Id.*

Harwell confirms Wilkins' and Smith's understandings, testifying that:

I discussed the matter with Foster McDonald [who is president of DeltaCom]. Without making a determination or seeking a legal opinion as to the validity or enforceability of the non-solicitation agreements, I specifically instructed Wilkins and Smith not to solicit business from customers and prospects they had called on while employed with Digitel. That directive is still being enforced by DeltaCom and, to my knowledge, Wilkins and Smith have not violated that directive.

Harwell Aff. at ¶ 10. Moreover, Harwell denies having asked Wilkins or Smith for a list of Digitel's customers or prospective customers and denies that Wilkins or Smith ever provided Harwell with such a list, verbal or written. *Id.* ¶ 13.

Digitel alleges, however, that Wilkins and Smith have in fact violated their non-solicitation agreements directly and indirectly and have done so at DeltaCom's behest and with DeltaCom's assistance and/or encouragement. *See* Pl.'s Supp. Br. (5/6/96) at 4. Specifically, Digitel alleges that Smith has solicited, on behalf of DeltaCom, the following customers with which he had contact while employed by Digitel: UniFirst, Radisson Admiral Semmes Hotel, Collins Signs, Donnell Trucking, Jones Space Link, and Couch Construction. *Id.* at 6–7.

*UniFirst:* It is undisputed that Digitel did time and material work for UniFirst and that Smith, while employed by Digitel, talked to UniFirst about a new telephone system. Smith Dep. at 24. Pointing to a DeltaCom Sales Order, dated December 1, 1995, Digitel alleges that Smith and Wilkins, acting on behalf of DeltaCom, sold UniFirst a new telephone system. Pl.'s Ex. 41. Smith confirms that at UniFirst's request, he and Wilkins called on UniFirst and sold them a new telephone system. Smith Dep. at 26. Defendants argue, however, that (1) Wilkins and Smith did not solicit UniFirst because they only visited UniFirst at UniFirst's request and (2) there is no evidence in the record that Digitel has ever sold telephone *equipment* to UniFirst or entered into a service and maintenance agreement with them. Johnson Dep. at 34–35. In her testimony, however, Mary Johnson, who is Office Administrator for UniFirst, indicated that

7. Wilkins testified that:

Well, my instructions were that if you call me, and you were a Digitel customer, to pass it on. And as far as assisting—for instance, if you wanted a maintenance contract, I could help Ed [Blackwell], as far as showing him how to put it together, and that was it.
Wilkins Dep. at 90.

UniFirst purchased paging horns and a telephone system, which includes "parts," thereby suggesting that telephone equipment had indeed been purchased by Uni-First from Smith and Wilkins. *Id.* 27.

*Radisson Admiral Semmes Hotel:* It is undisputed that Radisson Admiral Semmes Hotel was a customer of Smith's while he worked at Digitel. Smith Dep. at 33. Smith sold them "a large telephone system," and after he resigned from Digitel, he called to apologize to the manager, Kashi Misra, because he would be unable to be at the hotel for the installation of the new system. *Id.* Smith admits that since that time, he has called on Misra two or three times, along with DeltaCom salesperson David Rawls. *Id.* at 32–36. Smith denies, however, discussing telephone equipment or service or maintenance contracts with Misra during those calls. *Id.* at 36.

*Collins Signs:* Digitel also alleges that Smith violated the non-solicitation provision by calling on and selling a "technical service" to Collins Signs during January, 1996. *See* Pl.'s Ex. 45 (print-out showing a sale of $1,709.60 with a commission of $136.77 going to Smith and Wilkins). Collins Signs had been a former customer of Smith and Digitel, Smith having sold a "voice mail upgrade" to Collins in May, 1995. *See* Pl's Ex. 22 (Digitel Customer Order Form to Collins Signs from Digitel, signed by Smith). Defendants argue, however, that the January sale, on behalf of DeltaCom, was paid on "moves, ads and changes," ("MAC's") a technical service offered by DeltaCom, and not for telephone equipment, and therefore, Smith and Wilkins have not violated the non-solicitation provision. A MAC simply refers to the service performed anytime a customer requests that an additional phone extension be added or that existing extensions be moved or changed in some way. Kusan Aff. at 1. Presumably, defendants are attempting to restrict the non-solicitation provision to equipment sales.

*Donnell Trucking:* Donnell Trucking ("Donnell") is also a former customer of Smith and Digitel. Smith sold Donnell over $60,000 in telephone equipment while

working for Digitel. *See* Pl.'s Exs. 19–21 (Digitel Customer Order Forms to Donnell signed by Smith and dated February 17, 1995, April 1, 1995, and April 2, 1995, respectively). Just as with Collins Signs, Smith and Wilkins made a sale of $2,500 in January, 1996, and split a commission of $250. *See* Pl.'s Ex. 45. Again, defendants claim that this sale was for a MAC and did not include phone equipment. *Id.*

*Jones Space Link:* Digitel points out that Smith made a sales call on Jones Space Link, a potential customer of Digitel, in August 1995. Pl.'s Ex. 25 (Smith's Digitel expense report showing call on Jones Space Link Cable). In December 1995, Smith paid a similar call on Jones Space Link, only this time on behalf of DeltaCom. Pl.'s Ex. 42 (Smith's DeltaCom travel expense report showing call on December 21, 1995); *see also* Smith Dep. at 188, 196.

*Couch Construction:* While working with Digitel, Smith sold almost $4,000 in telephone equipment to Couch Construction. *See* Pl.'s Ex. 27 (Digitel Customer Order Form to Couch Construction, signed by Smith and dated September 12, 1995). But in January 1996, Smith paid a call on Couch Construction in Tampa, Florida, on behalf of DeltaCom. Pl.'s Ex. 46 (Smith's DeltaCom Travel Expense Report showing sales call on Couch Construction on January 17, 1996). Again, Smith denies selling any equipment to Couch, but rather explains it as visiting Couch in order to help the "long distance people in hooking a data line for Couch, Incorporated." Smith Dep. at 189.

Digitel also alleges that Wilkins has solicited, on behalf of DeltaCom, Collins Signs, Slocomb National Bank, and Merchants & Farmers Bank, customers with whom he had contact while he was employed by Digitel. *Id.* at 7–8.

*Collins Signs:* Digitel alleges that Wilkins, like Smith, violated the non-solicitation provision by calling on Collins Signs, a former customer of Digitel, with Smith. *See* Pl.'s Exs. 6, 8 (Digitel Customer Orders to Collins Signs signed by Wilkins

and dated June 29, 1993, and December 30, 1993). As discussed above, Smith and Wilkins called on and sold a technical service, i.e., a MAC, to Collins Signs during January, 1996. *See* Pl.'s Ex. 45 (print-out showing a sale of $1,709.60 with a commission of $136.77 going to Smith and Wilkins).

*Slocomb National Bank:* It is undisputed that Slocomb National Bank ("Slocomb") is a former time and material customer of Digitel. Wilkins Dep. at 252. Additionally, Wilkins admits to calling on Slocomb as part of a "cold call" during February, 1996, on behalf of DeltaCom. *Id.* at 251. Wilkins also admits discussing with Slocomb a system upgrade or a new system, but states that he turned down this business and instead passed the information on to another DeltaCom employee, Melinda Coleman. *Id.* at 248–49.

*Merchants and Farmers Bank:* Wilkins also admits cold calling on Merchants and Farmers Bank ("M & F Bank") in Donalsonville, Georgia, in January or February, 1996, and that M & F Bank was a former time and material customer of DeltaCom's. *Id.* at 253. After the cold call, a representative of M & F Bank called Wilkins and requested some information on types of available systems. *Id.* at 250, 252. Wilkins again passed the information on to another DeltaCom representative, Rick Nelson. *Id.* at 250.

Digitel also claims that Wilkins assisted other DeltaCom employees in soliciting Digitel customers. Digitel suggests that Wilkins, with Kusan, developed a plan aimed toward persuading Digitel customers to "jump ship." Wilkins admits that he suggested a marketing plan to Kusan in which DeltaCom would honor Digitel service and maintenance contracts. *Id.* at 174. Wilkins denies, however, putting together or providing for Kusan a list of potential Digitel targets. *Id.* at 174–75. Digitel also alleges that Wilkins indirectly solicited Digitel customers by assisting DeltaCom employees, Denise Cutts ("Cutts") and/or Blackwell, in preparing quotes for the sale of equipment to the following Digitel Customers: Eufaula City Schools, Dairy Fresh, Southland Bank and Dunbarton Manufacturing *Id.* at 8–9.

*Eufaula City Schools:* Eufaula City Schools ("Eufaula") purchased a new telephone system from Digitel in July, 1995. Wilkins Dep. at 182. Eufaula also had a maintenance agreement with Digitel but elected not to renew it after December 31, 1995. Knorr Dep. at 7; Wilkins Dep. at 147, 181; Blackwell Dep. at 35.

Sometime after Wilkins had started working with DeltaCom, Cutts prepared a proposal for a maintenance agreement/service contract with Eufaula. *Id.* at 163. While preparing that proposal, she asked Wilkins and he told her about what kind of system Eufaula had. Wilkins Dep. at 163–64. Additionally, Wilkins assisted Cutts with a "long distance dialer problem" that Eufaula was having, again telling Cutts what type of equipment Eufaula had. *Id.* at 165, 167. Wilkins denies have any other conversations about Eufaula and states that since he has been employed by DeltaCom, he has spoken directly to Rusty Knorr, Eufaula's administrative assistant, only once, when he answered the phone and directed Knorr's call to Blackwell. *Id.* at 181.

*Dairy Fresh:* Wilkins also sold equipment to Dairy Fresh in 1992 or 1993, while he worked with Digitel. *Id.* at 168–69. Eventually, however, Dairy Fresh changed their maintenance agreement from Digitel to General Telephone. *Id.* at 169. After Wilkins began working for DeltaCom, Dairy Fresh called Cutts and requested a quote on a voice mail system. *Id.* at 168. Cutts informed Wilkins of Dairy Fresh's request, but he chose not to pursue it, saying it was a "gray area" and, instead, passed the potential sale to Cutts and Melinda Coleman, another DeltaCom employee. *Id.* at 169–70. Nevertheless, Wilkins acknowledges assisting Cutts and Coleman in preparing the quotation by checking on the price of a voice mail system. *Id.* at 170–71.

*Southland Bank:* Southland Bank purchased its telephone system for its Dothan location from Digitel in 1993. Winter Dep. at 9. Wilkins was the sales agent for that

purchase. *Id.* at 10. Additionally, Southland Bank had entered a maintenance contract with Digitel, which expired January 12, 1996. *Id.* at 10–11, 24. In November, 1995, Southland Bank was also using DeltaCom for all of its long distance services. *Id.* at 12.

Judy Winters, Vice President of Operations at Southland Bank, testifies that she spoke with Wilkins by telephone "toward the end of the year [1995]," but she does not remember whether she or Wilkins initiated the call. *Id.* at 14–15. Winters reports, however, that during her conversation with Wilkins she requested DeltaCom provide Southland Bank with a bid for a new hardware maintenance contract. *Id.* at 29, 38. On December 11, 1995, Southland Bank notified Digitel that it was not planning to renew the telephone maintenance agreement; instead, Southland Bank accepted the bid submitted by DeltaCom. *Id.* at 25.

Wilkins states that Winters initiated the call; Winters had a question regarding whether the Digitel maintenance agreement covered lightning damage. Wilkins Dep. at 149. Wilkins also admits that he assisted Cutts and Blackwell in preparing the Southland Bank bid, by assisting Cutts in completing a calculation sheet that determines pricing.[8] *Id.* at 151. Additionally, Blackwell testified that Wilkins gave him the price for the Southland Bank quote. Blackwell Dep. at 36–37.

*Dunbarton Manufacturing:* Prior to October, 1995, Dunbarton Manufacturing ("Dunbarton") had a maintenance agreement with Digitel for its telephone system and used DeltaCom as its long-distance service. Giesman Dep. at 6–8. In the Fall of 1995, Wilkins and Smith, on behalf of Digitel, prepared and submitted a bid to Dunbarton for a new telephone system. Giesman Dep. at 44; *see also* Pl.'s Ex. 26

(Digitel Proposal to Dunbarton signed by Smith, dated Sept. 5, 1995). Dunbarton, however, decided to wait until April 1996 before purchasing a new telephone system, and William Giesman ("Giesman"), Dunbarton's Vice President of Finance, informed Wilkins and Smith of the decision to wait. Giesman Dep. at 45. Additionally, Dunbarton decided not to renew its maintenance contract with Digitel, but instead to proceed on an "as-needed" basis. Giesman Dep. at 8.

Giesman also testified that he has had only two contacts with Rick Wilkins since November 1995 and that he, not Wilkins, initiated both of those contacts. *Id.* at 62. Specifically, Giesman telephoned DeltaCom and requested that Rick Wilkins quote a hardware system for him. *Id.* at 59–60. Wilkins never provided Giesman with a quote, instead passing the request on to Cutts. Wilkins Dep. at 155. Wilkins does admit, however, that he assisted Cutts in preparing the quote by answering some technical questions regarding "the T–1 configuration." *Id.* at 161.

Citing to the above testimony, Digitel alleges that both Wilkins and Smith have violated their non-solicitation clauses. Moreover, Digitel alleges that DeltaCom has engaged in a scheme whereby Wilkins and Smith are permitted to indirectly solicit Digitel's customers through other DeltaCom employees. Digitel contends that the only way it may be protected from DeltaCom's conduct is to enjoin DeltaCom, as well as Wilkins and Smith, from accepting any system sales or maintenance business from Digitel's Dothan area customers or from its prospective customers with which Wilkins or Smith had contact.[9]

### STANDARD FOR ISSUANCE OF PRELIMINARY INJUNCTIONS

The grant or denial of a preliminary injunction is a matter within the discretion of

---

8. Wilkins describes the pricing sheet as:
a fill-in-the-blank thing. Asks how many telephones you have, how many out lines you have, and any peripheral equipment, such as a console or a call acting system. And then for each of the items you have, you bring it over to the right, and then you have a total number of items. You take the total number of items and there's a—I forget—you multiply your total

number of items times that to determine your maintenance cost. [It is a] matrix formula. *Id.* at 151.

9. To this end, Digitel has submitted, *in camera*, a list of its Dothan area customers which it believes the defendants should be enjoined from soliciting.

the district court. *Ferrero v. Associated Materials, Inc.,* 923 F.2d 1441, 1448 (11th Cir. 1991). While *Federal Rule of Civil Procedure* 65 covers only procedural requirements for issuing a preliminary injunction, federal courts have interpreted Rule 65 to incorporate several common law substantive requirements. The Eleventh Circuit Court of Appeals has established a four-prong test for determining whether a preliminary injunction should issue. Under this test, the party moving for a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the preliminary injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm that the injunction may cause the opposing party; and (4) that granting preliminary injunctive relief is not adverse to the public interest. *Ferrero,* 923 F.2d at 1448; Fed.R.Civ.P. 65.

"The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four requisites." *U.S. v. Jefferson County,* 720 F.2d 1511 (11th Cir.1983) (quoting *Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567 (5th Cir. 1974)). Although the court may balance "the evidence presented for each of [the four] criteria ... on a sliding scale," the plaintiff nevertheless still carries "the burden of showing all four." *Georgia Gazette Pub. Co. v. U.S. Dept. of Defense,* 562 F.Supp. 1004, 1008 (S.D.Ga.1983) (citation omitted).

## DISCUSSION

### I. Preliminary Injunction Against Wilkins and Smith

#### A. Substantial Likelihood of Success on the Merits

■ To demonstrate a substantial likelihood of succeeding on the merits of its claim for breach of the non-solicitation provisions, Digitel must demonstrate that the non-solicitation provisions are valid and enforceable. Although § 8–1–1 of the *Alabama Code* (1993) prohibits contracts restraining business, "partial restraints of trade may, in appropriate circumstances, be enforceable."

*Hoppe v. Preferred Risk Mut. Ins. Co.,* 470 So.2d 1161, 1164 (Ala.1985). For instance, in *Hoppe,* the Alabama Supreme Court held that an agreement which did not prohibit the defendant, an insurance agent, from doing business, but merely from soliciting former policyholders, was only a partial restraint of trade and, therefore, not violative of § 8–1–1. 470 So.2d at 1164; *see also Famex, Inc. v. Century Ins. Services, Inc.,* 425 So.2d 1053 (Ala.1982) (holding that non-solicitation clause does not violate § 8–1–1 of *Alabama Code* (1994)).

■ It is clear in the instant case that the clause Digitel is seeking to enforce is a non-solicitation clause. The clause specifically states that the signing employee agrees to refrain "from soliciting or accepting, directly or through others, any business from any of Digitel's customers, including actively sought perspective [sic] customers with whom [the signing employee has] had contact with during [his] employment with Digitel." Digitel does not appear to be requiring Wilkins or Smith to not compete with Digitel, but merely to refrain from calling on customers with whom they had contact while they were employed at Digitel. "A prohibition against soliciting the plaintiff's customers whose identities became known to the defendant in confidence as a result of the parties' relationship is not the same as a prohibition against engaging in a lawful profession, trade, or business." *Hoppe,* 470 So.2d at 1163. Accordingly, the court finds that the non-solicitation provision in Wilkins' and Smith's compensations agreements are only partial restraints on trade, and, consequently, fall outside the restrictions of § 8–1–1 of the *Alabama Code* (1994).

■ To determine, however, whether the non-solicitation agreement should be enforced, the court must examine "the facts of the particular case" and make a determination "as to whether the restriction upon one person is greater than necessary for the reasonable protection of a substantial interest of the other party." *Affiliated Paper Companies, Inc. v. Hughes,* 667 F.Supp. 1436, 1447 (N.D.Ala.1987). Alabama courts have shown a willingness to uphold such contracts where they are "properly restricted

as to territory, time and persons and where they are supported by sufficient consideration." *Famex*, 425 So.2d 1053, 1055 (Ala. 1982) (quoting *Hibbett Sporting Goods, Inc. v. Biernbaum*, 391 So.2d 1027, 1029 (Ala. 1980)).

■ Before addressing the issues of sufficient consideration and reasonableness of the non-solicitation clause, the court turns first to Wilkins' argument that he is not bound by the clause because although he signed the compensation agreement, he did not return the signed compensation agreement to personnel. Wilkins argues that "since Digitel did not pursue having Wilkins sign the agreement and continued to employ him and pay him under this agreement they should be estopped for trying to enforce said non-solicitation clause contained in said agreement." Wilkins Br. at 6. The court is unpersuaded by such an argument and finds that the agreement was a valid contract stating the terms of compensation.

■ "The object of a signature is to show mutuality and assent, which may be shown in other ways, and unless a contract is required by statute to be in writing, it need not be signed, provided it is accepted and acted upon." *Lawler Mobile Homes, Inc. v. Tarver*, 492 So.2d 297, 304 (Ala.1986). Wilkins admits he signed the compensation agreement, and this would indicate at least a tentative mutuality and assent. Moreover, "[a] party, by his actions and acceptance of the benefits of a contract and by operating under that contract, may ratify and confirm it, even though his actual signature is not affixed." *Id.*, citing *Rush v. Atomic Electric Co.*, 384 So.2d 1067 (Ala.1980). In the instant action, even though Wilkins failed to return the modified agreement to personnel, he admits that he was paid pursuant to that compensation agreement, thereby receiving the benefits of the contract and appearing to operate under, and therefore, to ratify, that contract. Consequently, the court finds a valid contract between Wilkins and Digitel.

■ There is no question that the contracts are supported by adequate consideration. The Alabama Supreme Court "has previously held that continued employment

and compensation in return for a promise not to compete constitutes consideration." *Corson v. Universal Door Systems, Inc.*, 596 So.2d 565, 568 (1991); *see also Daughtry v. Capital Gas Co.*, 229 So.2d 480 (Ala.1969). In the instant action, Wilkins' consideration for agreeing to the non-solicitation provision was the modified agreement, which outlined the terms of Wilkins' compensation and made it "easier" to obtain bonuses. Similarly, Smith's consideration for agreeing to the non-solicitation provision was the continued compensation arrangement.

■ The court also finds that the non-solicitation clause is reasonable as to territory, time and persons. It is true that the clause does not specify what territory Wilkins and Smith are restricted from canvassing for customers. Wilkins suggests that such an omission is an oversight which must be construed against Digitel. Wilkins' Br. at 6. The court disagrees. Although the clause does not describe a specific geographic territory, the territory is inherently limited by its restriction of solicitation of former or prospective Digitel customers with whom Wilkins or Smith had contact. Such a group, by necessity, would only include customers and prospective customers in Alabama and portions of Georgia and Florida. This tri-state area is a reasonably limited geographic scope. *See Corson v. Universal Door Systems, Inc.*, 596 So.2d 565 (Ala.1991) (holding that a clause restricting solicitation of customers in eight states, three in which the plaintiff did not do business, was reasonable); *see also Famex*, 425 So.2d at 1054 (upholding a non-solicitation clause which did not state a territorial restriction but instead restricted parties from soliciting any former insureds for a period of three years).

As to the issue of duration, the court finds that two years is a reasonable time to bind Wilkins and Smith. In *James S. Kemper & Co. Southeast, Inc. v. Cox & Associates, Inc.*, 434 So.2d 1380, 1384 (1983), the Alabama Supreme Court found that in the case of the more onerous non-compete clause, as opposed to a less onerous non-solicitation clause, there could "be no doubt that a two-year period for the restriction is reasonable." In *Famex*, where the court was considering

the reasonableness of a non-solicitation clause, the court found that *three years* was a reasonable time restriction. 425 So.2d at 1054. Accordingly, the court finds that a two-year period is not an unreasonable length of time for which Wilkins and Smith may be bound.

The court also finds that the non-solicitations agreements are reasonably restricted as to persons. In his brief, Wilkins argues that Digitel fails to adequately define its customer base or to define solicitation, and, therefore, the clause should be construed against Digitel. Wilkins Br. at 6. The court is not persuaded by Wilkins' argument of vagueness and ambiguity. The provision states that the signing employee, i.e., Wilkins or Smith, will refrain from "soliciting or accepting, directly or through others, any business *from any of Digitel's customers, including actively sought perspective* [sic] *customers with whom* [Wilkins or Smith] *have had contact with during* [their] *employment with Digitel.*" (Emphasis Added.) Clearly, then, Wilkins and Smith are to avoid those customers (or prospective customers) on which they called during their employment with Digitel.

Additionally, the restriction on persons is not unreasonable. In *Corson*, the Alabama Supreme Court found a non-solicitation clause reasonable where a former employee was restricted from soliciting *any* of the plaintiff's customers, even those customers with whom the employee may not have had contact. 596 So.2d at 568. Similarly, in *Hoppe*, the Court upheld a non-solicitation clause which prohibited the former employee, an insurance agent, from soliciting *any* former policyholder. 470 So.2d at 1162. In the instant case, Digitel is not attempting to prohibit Wilkins and Smith from contact with *any* Digitel customer, but only those customers or prospective customers on whom Smith or Wilkins called. Based on the foregoing,

the court finds that the non-solicitation clause between Digitel and defendants Wilkins and Smith is valid and enforceable.

■ The court now must turn to the question of whether Digitel has shown a substantial likelihood that it will prevail on the merits of its claim against Wilkins and Smith for breach of the non-solicitation agreements. The court finds that Digitel has presented sufficient evidence of Wilkins' and Smith's actions to demonstrate it is substantially likely that it will be able to show that the two men have violated the non-solicitation agreement, and therefore, that it will likely prevail on a breach of contract action against them. Wilkins readily acknowledges that after beginning his employment with DeltaCom he called on at least three former Digitel customers: UniFirst,[10] Slocomb National Bank, and Merchants & Farmers Bank. With regard to the latter two customers, Wilkins stated that when he learned they might be interested in purchasing a telephone system from DeltaCom, he "passed" the "lead" on to other DeltaCom personnel. Despite Wilkins' protestations, it appears likely that he has violated the non-solicitation agreement by calling on former Digitel customers. The clause prohibits Wilkins from calling on *any* former Digitel customer with whom he had contact, and Wilkins admits calling on at least three of those former customers. Moreover, Digitel presented evidence that Wilkins assisted DeltaCom employees in soliciting former Digitel customers, albeit indirectly, by assisting in bid proposals. This evidence is sufficient to establish that Digitel is substantially likely to prevail against Wilkins on the merits of its actions.

■ Digitel has also shown that it is substantially likely to prevail against Smith for breach of the non-solicitation agreement. Smith admits that soon after joining DeltaCom, he and Wilkins called on UniFirst, selling them a new telephone system. Smith

10. In some instances, Wilkins and Smith contend that they did not violate the non-solicitation agreement because they did not initiate the call. The court finds that argument somewhat unconvincing in a circumstance where Wilkins and Smith, in response to a customer's request, provided a quote or prepared a bid in order to obtain a former Digitel customer's business. *See*

*Black's Law Dictionary* (6th Ed.1990) (defining "solicit" in part as "to try to obtain"); *see also Clark v. Liberty Nat'l Life Ins. Co.*, 592 So.2d 564, 565–66 (Ala.1992) (upholding a nonsolicitation clause proscribing "receiving, writing or accepting" business from the former employer's customers).

also acknowledges that he has paid at least two visits to Radisson Admiral Semmes Hotel, a Digitel customer, and though he denies talking "business," these visits were made in the company of another DeltaCom representative. Additionally, Smith acknowledges calling on Jones Space Link and Couch Construction, former Digitel customers, after he began working for DeltaCom. This evidence is sufficient to establish a substantial likelihood that Digitel will prevail against Smith on the merits of this action.[11]

### B. Irreparable Injury Will Occur Absent Injunctive Relief

In order to obtain injunctive relief, Digitel must also show that it will suffer irreparable harm absent that injunctive relief. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ferrero v. Associated Materials, Inc.,* 923 F.2d 1441, 1449 (11th Cir.1991) (quoting *Cate v. Oldham,* 707 F.2d 1176, 1189 (11th Cir.1983)). In the instant action, Digitel claims that if Wilkins and Smith continue to solicit former Digitel customers, Digitel stands to lose both its customers and their goodwill. The former Fifth Circuit held that the loss of customers and goodwill is an "irreparable" injury. *Ferrero,* 923 F.2d at 1449 (citing *Spiegel v. City of Houston,* 636 F.2d 997 (5th Cir., Unit A, 1981)).[12] The court agrees that such an injury would be impossible to calculate monetarily and that Digitel is vulnerable to irreparable harm.

### C. The Threatened Injury to Digitel Outweighs the Damage to Wilkins and Smith

In determining whether to grant injunctive relief, the court must also weigh the balance of harm between the parties. As discussed previously, Digitel faces a potentially irreparable injury in the form of lost customers and goodwill. On the other hand, Wilkins and Smith are faced with a loss of potential commissions if they are prohibited from soliciting, directly or indirectly, Digitel customers during the next 15 months. Although Wilkins and Smith may be faced with a substantial injury through the loss of income, Wilkins and Smith are not faced with a blanket restriction against practicing their trade in the Dothan area nor are they restricted from working with DeltaCom. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty,* 808 F.Supp. 1555, 1560 (S.D.Fla. 1992) (determining that "[t]he harm to the defendant[s] ... is mitigated by [their] ability to solicit new clients."), *aff'd,* 2 F.3d 405 (11th Cir.1993). Based on these considerations, the court finds that the threatened injury to Digitel outweighs the damage the injunction might cause Wilkins and Smith.

### D. The Public Interest Will Not be Harmed by the Injunction

The public interest factor is an elusive one in that opposing parties generally can make reasonable arguments that the public interest favors each side of a dispute. The court agrees with Digitel that "the law favors active but fair competition." *Combined Ins. Co. v. Investors Consol. Ins. Co.,* 499 F.Supp. 484, 488 (E.D.N.C.1980). While Digitel's former customers have an interest in access to a free and open market, that market cannot stand free and open in the face of conduct which may be deemed unfair. Accordingly, the court finds that the public interest will not be harmed by the issuance of an injunction against Wilkins and Smith.

---

**11.** The court finds it unnecessary to determine at this time whether Smith's and Wilkins' "non-equipment" sales, on behalf of DeltaCom, to Digitel customers violates the non-solicitation agreement. The court points out, however, that if the non-solicitation agreement is indeed meant to protect Digitel's relationship with its customers and its goodwill, then a solicitation of a Digitel customer for *any* telephone-related type service would appear to violate the non-solicitation agreement.

Additionally, because the court finds that Digitel is substantially like to succeed on the breach of contract claim against Wilkins and Smith, the court finds it unnecessary to determine at this time whether Digitel is substantially likely to prevail against Smith and Wilkins for misappropriation of trade secrets.

**12.** Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

## II. Preliminary Injunction Against Delta-Com

Digitel brings two claims against Delta-Com: (1) tortious interference with Digitel's contractual and business relations with its customers and prospective customers by hiring all of Digitel's Dothan staff and (2) tortious interference with Digitel's non-solicitation agreements with Wilkins and Smith by aiding, abetting, permitting and encouraging them to breach the non-solicitation agreements. Alleging the threat of irreparable harm, Digitel requests the court to enjoin DeltaCom from accepting any telecommunications systems sales or maintenance business from any of Digitel's Dothan area customers, a list of which has been filed with the court *in camera*. Because Digitel is unable to show that it is substantially likely to prevail on the merits of its claims against Delta-Com, the court finds that Digitel's request for injunctive relief against DeltaCom is due to be denied.[13]

 "The tort of interference with business relations consists of an intentional act of interference which causes harm to the plaintiff's business." *L.A. Draper & Son, Inc., v. Wheelabrator–Frye, Inc.*, 813 F.2d 332, 337 (11th Cir.1987). Alabama has long recognized that "rights of a party to a contract or business relation are of paramount importance in the business community and should be protected from unjustified interference by third persons." *Gross v. Lowder Rlty. Better Homes & Gardens*, 494 So.2d 590, 596 (Ala.1986). In order to establish a prima facie case of tortious interference, Digitel must show: (1) the existence of a contract or business relation; (2) DeltaCom's knowledge of the contract or business relation; (3) intentional interference by Delta-Com with the contract or business relation; and, (4) damage to Digitel as a result of defendant's interference. *See Century 21 Academy Realty, Inc. v. Breland*, 571 So.2d 296, 297 (Ala.1990).

 First, Digitel claims that DeltaCom tortiously interfered with its business and contractual relations with its customers and prospective customers by hiring all of Digitel's Dothan office. Digitel maintains that DeltaCom did this in order to cripple Digitel and, then, initiated a systematic attack on Digitel's customer base by having Wilkins and Smith solicit former Digitel customers. To support its claim of tortious interference, Digitel points to *Draper*, where the Eleventh Circuit allowed the plaintiff to pursue a claim of tortious interference with business and contractual relations where the plaintiff alleged that the defendant had unlawfully lured away the plaintiff's employees, that the defendant had breached his fiduciary duty to the plaintiff, and that the defendant had lured away the plaintiff's suppliers. 813 F.2d at 335.

The allegations in *Draper* are a far cry from the facts in the instant case.[14] Although DeltaCom acknowledges that it hired Digitel's Dothan workforce, thus suggesting interference with a contractual employment relationship, Digitel has produced little other evidence which would support a claim of tortious interference by DeltaCom. Digitel has presented evidence that Wilkins and Smith solicited former Digitel customers, but, by the same token, DeltaCom has presented evidence that both Wilkins and Smith were specifically directed to stay away from Digitel customers, pursuant to the non-solicitation provision of their compensation agreements with Digitel. To support its claim that DeltaCom engineered a "systematic" plan, using Wilkins and Smith, to lure away Digitel's customers, Digitel points to the plan

---

**13.** Additionally, when considering whether to enjoin DeltaCom, who was never a party to the non-solicitation agreement, from accepting any business from a former Digitel customer, the court is not convinced that such an injunction would not operate against the public interest in having access to an "open" telecommunications market and the right to choose their telecommunications provider. It is one thing to restrict the general public from dealing with two particular representatives of a company and quite another thing to restrict the public from dealing with an entire company.

**14.** The court notes that the *Draper* court did not find a substantial likelihood of success on the merits, but instead, permitted the plaintiff, who was changing legal theories mid-trial, to pursue the new legal theory of tortious interference because he had sufficiently laid the groundwork in his complaint for such a theory.

suggested by Wilkins and developed by Kusan to honor Digitel service and maintenance contracts. Digitel has not introduced any evidence, however, that would indicate that Wilkins played an active role in targeting Digitel customers. Consequently, the court is unable to find that Digitel is substantially likely to prevail against DeltaCom on the merits of its claim of tortious interference with its business and contractual relations with its customers.

■ Second, Digitel claims that DeltaCom has tortiously interfered with Digitel's non-solicitation agreements with Wilkins and Smith by aiding, abetting, permitting and/or encouraging them to breach the non-solicitation agreements. While Digitel has established a valid contract about which DeltaCom had knowledge, Digitel has failed to show that DeltaCom intentionally interfered with the non-solicitation provisions. The court once again acknowledges that Digitel has produced evidence suggesting that Wilkins and Smith violated their non-solicitation clauses; however, Digitel has provided little, if any, evidence that would indicate an intent on DeltaCom's part to subvert Wilkins' and Smith's agreement with Digitel. Moreover, DeltaCom has produced evidence indicating that Wilkins and Smith were specifically ordered to stay away from former Digitel customers. There is little indication that DeltaCom management has directed or encouraged Wilkins and Smith to use other DeltaCom employees, overtly or covertly, to solicit Digitel customers. Furthermore, Wilkins denies providing Kusan with a list of Digitel customers that might be willing to take advantage of DeltaCom's offer to honor Digitel contracts. And though Digitel points to admissions of Blackwell that he and Cutts solicit Digitel customers that Wilkins and Smith are prohibited from soliciting as evidence that DeltaCom is using other employees to subvert the non-solicitation agreements, the court is unable to conclude that such evidence establishes a substantial likelihood that Digitel will prevail on the merits of its claims of tortious interference with the non-solicitation agreements.

■ Finally, Digitel argues that even if DeltaCom were unaware of Wilkins' and Smith's alleged tortious activities, it is still liable for those tortious acts because they were performed in furtherance of DeltaCom's business and were within the scope of their duties. *See U.S. Steel Co. v. Butler,* 260 Ala. 190, 69 So.2d 685 (1953). General agency law in Alabama holds that a principal may be held liable for intentional torts of its agents where "the agent's wrongful acts were (1) in the line and scope of his employment; or (2) that the acts were in furtherance of the business of [the principal]; or (3) that [the principal] participated in, authorized, or ratified the wrongful acts." *Todd v. Modern Woodmen of America,* 620 So.2d 591 (Ala.1993). Although DeltaCom may ultimately find itself liable under a theory of *respondeat superior* for the acts of Wilkins, Smith, Blackwell, Cutts, and/or Kusan, the court declines to bind DeltaCom, on the basis of vicarious liability, to a non-solicitation agreement to which DeltaCom was not a party.

Digitel argues that *Daughtry v. Capital Gas Co.,* 229 So.2d 480 (Ala.1969), authorizes the court to enjoin an employee, as well as his current employer even if not a party to the covenant not to compete, from "aiding, abetting, permitting or encouraging" the employee to violate the non-compete agreement. But as DeltaCom points out, *Daughtry* can be distinguished from the instant case in that the defendant employee had entered into *a covenant not to compete* with his former employer. 229 So.2d 480. The mere act of hiring the defendant employee could have been construed as "aiding, abetting, permitting or encouraging" the defendant employee's breach of the covenant not to compete. In the instant case, however, the mere act by DeltaCom of hiring Wilkins and Smith is insufficient to establish that DeltaCom aided the two men in breaching their covenant not to solicit. Furthermore, as discussed above, Digitel has presented little evidence indicating that DeltaCom encouraged or even permitted the two men to breach the non-solicitation clauses. For these reasons, the court is unwilling to rely on *Daughtry* as a basis

for exercising its extraordinary remedial powers.[15]

## CONCLUSION

Based on the foregoing, the court finds that Digitel's motion for preliminary injunction is due to be granted in part and denied in part.

In sum, Digitel is entitled to the issuance of a preliminary injunction in this action restraining and enjoining defendant Wilkins, pending a final hearing of this cause, from directly or indirectly soliciting (to include assisting in the soliciting) or accepting, directly or through others, *any business* from any of Digitel's former customers with which he had contact while employed with Digitel, as well as from any actively sought prospective customers with which he had contact while employed with Digitel. Additionally, Digitel is entitled to the issuance of a preliminary injunction in this action restraining and enjoining defendant Smith, pending a final hearing of this cause, from directly or indirectly soliciting (to include assisting in the soliciting) or accepting, directly or through others, *any business* from any of Digitel's former customers with which he had contact while employed with Digitel, as well as from any actively sought prospective customers with which he had contact while employed with Digitel.

Before the court adopts Digitel's list of former and prospective customers, submitted to the court *in camera*, into a final preliminary injunction, defendants Wilkins and Smith shall be given an opportunity to review the list and make any objections thereto. Consequently, it is CONSIDERED and ORDERED that the following briefing schedule be and the same is hereby set:

(1) defendants Wilkins and Smith are directed to file under seal with the Clerk of the Court and with plaintiff's counsel on or before November 25, 1996, any objections to Digitel's submitted list and a brief in support of their objections, to include therein a statement of facts, citations of authority and any applicable conclusions of law;

(2) plaintiff Digitel is directed to file under seal a response to defendants' objections with the Clerk of the Court and with defendants Wilkins and Smith within seven days of receiving defendants' objections, and the responses shall also include therein a statement of facts, citations of authority and any applicable conclusions of law.

It is further CONSIDERED and ORDERED that the Clerk of the Court distribute only to defendants Wilkins and Smith the list of such former and prospective customers and to maintain said list under seal. Defendants Wilkins and Smith are RESTRAINED and ENJOINED, under pain of penalty, from sharing this list with any other persons, including but not limited to any DeltaCom representative.

Prior to the issuance of the preliminary injunction, Digitel shall file in the office of the Clerk of the Court proper security for the issuance of such injunction, corporate surety bond[s] in the principal amounts of $25,000 for Wilkins and $25,000 for Smith, conditioned as required by law for the payment of such costs and damages as may be incurred or suffered by defendants Wilkins and Smith being found to have been wrongfully enjoined or restrained. Such bond[s] must be approved by the Clerk.

Upon receipt of said bond[s] and pending final issuance of a preliminary injunction, defendants Richard A. Wilkins and John A.R. Smith shall be temporarily enjoined from contacting directly or indirectly, in any manner, any of the entities on "Digitel's List of Customers and Prospective Customers." Upon due consideration of any objections raised by defendants Wilkins and Smith and plaintiff's response thereto, the court shall amend the list accordingly and with all deliberate speed.

Digitel's motion for preliminary injunction restraining DeltaCom is denied.

---

**15.** The court notes that as long as Smith and Wilkins are enjoined from breaching their non-solicitation agreements, then, in keeping with the doctrine of vicarious liability, DeltaCom also will be prevented from breaching the agreements. Logically, then, there should be no need for the court to enjoin DeltaCom separately.

**1502**

An appropriate preliminary injunction shall issue.

All other questions are reserved.